THOMPSON, Presiding Judge.
Mary Texas Garner Robinson (“the wife”) appeals from a judgment of the Jackson Circuit Court holding invalid a *1069 antenuptial agreement into which she had entered with John Lawson Robinson (“the husband”). For the reasons set forth herein, we reverse the trial court’s judgment.
The husband and the wife became engaged in the spring of 1987. It is undisputed that, at the time of the parties’ engagement, the wife’s family owned a substantial amount of real property. During the summer of 1987, the wife employed Bill White, an attorney who had previously performed some legal work for the wife and the wife’s family, to prepare an ante-nuptial agreement (“the agreement”) for the parties to execute. On August 26, 1987, White sent a draft of the agreement to the wife, who shared it with the husband. In addition to providing that the husband would relinquish any claim to certain property the wife owned or stood to inherit, the agreement provided that the husband acknowledged that White represented only the wife and that the husband had the right to employ his own legal counsel to represent his interests with regard to the agreement. The husband thereafter began preparing a handwritten draft of an antenuptial agreement. The handwritten draft was provided to White, and he incorporated it into his final draft of the agreement.
The parties executed the final draft of the agreement on September 9,1987, three days before their wedding. In pertinent part, the agreement provided:
“1. This Agreement is entered into in consideration of marriage, and its effectiveness is expressly conditioned on such marriage between the parties actually taking place; and if, for any reason, the marriage is not consummated, this Agreement will be of no force or effect.
“2. A full and complete disclosure of all property owned by each of the parties, both real and personal, tangible and intangible, has been made to each other. It is stipulated and agreed by and between the parties hereto that the [wife] is, at the time of the execution of this Agreement, the owner of the following described property and it is further stipulated and agreed by and between the parties hereto that the [husband] does not own or have an interest in any of said property, which property is more particularly described as follows:
“A. A one-fourth (1/4) undivided interest in and to the following tracts or parcels of real property located in Jackson County, Alabama, to wit: [Paragraphs 2.A.(a)-(f) describe six parcels of real property containing several hundred acres of land.]
“B. Shares of the capital stock of Colonial Bank, Southtrust Corporation and Central Bank.
“C. Funds held in Certificates of Deposit issued by City Federal Savings of New Jersey, and any accumulations to or reinvestments of such funds.
“D. Any vested or contingent interests held or acquired by virtue of any Trust Indentures executed or established by Mary Texas Hurt Garner, the mother of the [wife].
“It is further, stipulated and agreed by and between the parties hereto that the [husband] is at the time of the execution of this Agreement, the owner of the following described property and it is further stipulated and agreed by and between the parties that the [wife] does not own or have any interest in the following described property:
“E. One (1) acre more or less known as Lot # 9 located in the Kidd-Bagwell Subdivision being in Section 21, Township 8, Range 7, DeKalb County, Alabama.
*1070 “F. One (1) acre more or less known as Lot # 10 located in the Kidd-Bagwell Subdivision being in Section 21, Township 8, Range 7, De-Kalb County, Alabama.
“G. One (1) acre more or less known as Lot #11 located in the Kidd-Bagwell Subdivision being in Section 21, Township 8, Range 7, De-Kalb County, Alabama.
“H. An undivided one-third (1/3) interest in the [husbandj’s family farm [on] which he grew up. This farm is located [in] Dawson, Alabama 35963, DeKalb County, Alabama. (A legal description is not available at the time of the execution of this Agreement; however, its location is known by both parties to this Agreement.)
“I. A one (1) acre lot known as Lot # 6 located in Ta-Co-Bet Cliffs Subdivision, Section 31, Township 5, Range 7E, Jackson County, Alabama.
“J. A gun collection which includes rifles, shotguns, and pistols considered to be worth several thousand dollars.
“3. The [wife] has, further, made a full and complete disclosure to [the husband] of the nature, extent, and probable value of all property and other assets, including contingent, limited or remainder interests in same, which she may in the future acquire by gift, bequest, devise, inheritance, purchase, or operation of law from her mother, Mary Texas Hurt Garner; her brother, William Texas Garner; her uncle, John Frank Hurt, and other ancestors, or from any trusts established or to be established by such persons. Although such property and assets are, at the time of the execution of this Agreement, expectancies and not necessarily vested interests, it is the intention and purpose of the parties hereto that such expectancies be treated in all respects under this Agreement as vested interests in the [wife], and that any such property or interests, when later vested, be deemed the separate property and estate of the [wife], and the [husband] does hereby waive and release all present or future rights, claims, title, and interest, in law and equity which he might, by reason of his marriage to [the wife], acquire in or to such property, assets and expectancies.
“4. Except as herein provided, the [husband] does hereby covenant and agree with the [wife] that he will neither during the lifetime of the [wife] nor after her death take, claim, demand or receive, and does hereby waive and release all rights, claims, titles and interest, actual, inchoate, or contingent, in law and equity which he might, by reason of his marriage to [the wife], acquire in or to the above-described property or estate of [the wife], including, but not limited to:
“A. The right or claim of homestead, dower or curtesy, or any statutory substitute therefor, as provided by the statutes of the state in which the [wife] dies domiciled or in which she may own real property;
“B. The right to any statutory exemptions, alimony, support or allowance;
“C. The right of election to take against the Last Will and Testament of the [wife];
“D. The right to a statutory or distributive share in the estate of the [wife] should she die intestate.
“Such waiver and release by the [husband] are specifically limited to rights, claims, title, or interest in and to the property and estate identified in paragraph 2(A) through 2(D), inclusive, and the expectancies as described in paragraph 3 hereinabove and shall not *1071 constitute a waiver or release by the [husband] of any right, claim, title, or interest in any other property acquired by either of the parties hereto.
“Except as herein provided, the [wife] does hereby covenant and agree with the [husband] that she will neither during the lifetime of the [husband] nor after his death take, claim, demand, or receive, and does hereby waive and release all rights, claims, titles and interest, actual, inchoate, or contingent, in law and equity which she might, by reason of her marriage to [the husband], acquire in or to the above-described property or estate of [the husband], including, but not limited to:
“A. The right or claim of homestead, dower, or curtesy, or any statutory substitute therefor, as provided by the statutes of the state in which the [husband] dies domiciled or in which he may own real property;
“B. The right to any statutory exemptions, alimony, support, or allowance;
“C. The right of election to take against the Last Will and Testament of the [husband];
“D. The right to a statutory or distributive share in the estate of the [husband] should he die intestate.
“Such waiver and release by the [wife] are specifically limited to rights, claims, title or interest in and to the property and estate identified in paragraph 2(E) through 2(J), inclusive, and shall not constitute a waiver or release by the [wife] of any right, claim, title, or interest in any other property acquired by either of the parties hereto.
[[Image here]]
“8. Anything hereinabove to the contrary notwithstanding, it is specifically agreed by and between the parties hereto that the [husband] shall, if he is the surviving spouse of the [wife], have the right to use and possess during his lifetime, free from the payment of rent or other charges, any dwelling house in which the parties hereto most usually resided next before the death of the [wife] and, in addition thereto, the right to use and possess up to two (2) acres of real estate adjoining the same, if the same is owned by the parties or either of them.
“It is further understood, stipulated, and agreed by and between the parties hereto that [the husband] is, at the time of the execution of this Agreement, the owner of and brings into the forthcoming marriage a family dwelling home described as follows: [description of one-acre parcel of property omitted]. Anything hereinabove to the contrary notwithstanding, it is specifically agreed by and between the parties hereto that the [wife] shall, if she is the surviving spouse of the [husband], have the right or claim of homestead, dower, or any statutory substituted therefor with respect to such property or estate.
“9. Each of the parties hereto do hereby acknowledge and confirm that [the wife] has employed J. William White, an Attorney at Law practicing in Scottsboro, Jackson County, Alabama, to represent her in the negotiation and preparation of this Agreement and both parties acknowledge that they understand that said attorney does not and cannot represent or serve as the attorney for both parties in the negotiation and preparation of this Agreement. The [husband] acknowledges that he understands that [White] represents only the [wife] and that he further understands that he has the right to employ counsel of his own choosing to represent his interest herein and further understands that it may be in his best interest *1072 to do so. Having been advised of the foregoing and having fully understood the same, the [husband] acknowledges and confirms that he has freely, voluntarily and with full knowledge executed this Agreement and has voluntarily and knowingly elected not to employ independent counsel to represent and to protect his interest herein.”
The parties married on September 12, 1987, and one child was born of their marriage. That child was 20 years old at the time of the hearing in this case.
On April 14, 2008, the wife filed an action for a divorce from the husband. In her complaint, she alleged the existence of the agreement, and she asked the court to “determine and find [that] the [agreement] of the parties is valid and operative between the parties,” to enforce the agreement, and to divide the parties’ remaining property that was not subject to the agreement. The husband filed an answer in which he admitted the existence of the agreement but denied that it was valid. He also filed a counterclaim seeking a divorce from the wife.
The wife filed a motion for the court to determine the validity of the agreement. The trial court held a hearing on that motion on November 5, 2009, at which it received ore tenus evidence.
At the hearing, White, the attorney who had drafted the agreement, testified that he was friends with the husband and the wife. He testified that, at some point before the parties had executed the agreement, he had had a conversation with the husband in which he had informed him that he was representing the wife with regard to the agreement and that he could not represent the husband with the regard to the agreement.
White testified that, before he prepared the final draft of the antenuptial agreement, he received a handwritten document that he understood to have been prepared by the husband. He testified that he incorporated some of that document into the final draft of the agreement. The handwritten document set out certain parcels of real property owned by the husband, as well as some of the husband’s personal property, that were to be excluded from the marital estate and to which the wife would waive any and all rights. White testified that he included that provision in the final draft of the agreement.
White testified that he did not recall the husband ever stating that the agreement was unfair, nor did he recall the husband ever stating that he needed to consult with other legal counsel before signing the agreement. White testified that he also did not recall any complaints by the husband that he had been coerced or forced to sign the agreement.
The wife testified that she worked with her brother managing her family’s real-estate holdings. She testified that she had inherited a substantial amount of real property from her mother and her uncle.
The wife testified that, at the time the husband and she became engaged, he was a law-school graduate and was employed with the Jackson County district attorney’s office.
The wife stated that, before their marriage, the parties discussed the fact that her family owned a substantial amount of real property and that it was owned by various members of the family. She stated that, in discussing with the husband why she wanted the agreement, she told him that it was important to her and to her family that the family’s real estate stay within her family. She testified that she raised the issue of an antenuptial agreement with the husband shortly after they became engaged and that he told her that she should have the agreement prepared *1073 in the manner she wanted and that he did not have anything to add to it. The wife testified that she provided the August 26, 1987, draft of the agreement to the husband and that the husband changed his mind at that time and decided to add some items to it. The wife stated that the husband’s handwritten document was consistent with what he had told her he wanted to do. She stated that she encouraged him to seek legal advice with regard to the agreement but that he chose not to do so. The wife testified that the husband did not make any statement about the fairness or unfairness of the argument to her before the filing of the complaint for divorce in this action and that he never told her that he was not going to sign it.
The wife stated that, before the parties signed the agreement, she had discussed with the husband the inheritance that she anticipated receiving from her family. She stated that the husband was aware that her family owned a substantial amount of real property and that the husband had hunted on some of the property her family owned.
The wife testified that she did not recall discussing the value of her bank stock with the husband. She testified that she did not provide any documents to him relative to the bank stock but that she did not recall his asking for any such information. She indicated that she did not recall a specific conversation in which she told him the value of her certificates of deposit or of their existence. She testified that she did not know whether the husband knew that there was a written trust agreement between her mother and her providing that she would manage her mother’s properties for her, but she stated that he knew that she was managing her mother’s properties. The wife testified that she believed the husband was aware of how much real property her family owned, although she indicated that she had never told him the monetary value of each property. She testified that she had a “very good idea” at the time the parties married of what she would be inheriting at her mother’s death. She testified that she was compensated under the trust agreement with her mother but that she did not give the husband specific information about her income. She testified that the parties did not exchange any tax returns or other financial statements before signing the agreement.
The husband testified that he had begun working in the district attorney’s office in 1975 as an investigator and later as a court coordinator. He testified that he graduated from law school in 1984; after graduating from law school, he continued working in the district attorney’s office. At the time of the hearing, he was a member of the Alabama House of Representatives.
The husband testified that, during the parties’ engagement, he did not know what property the wife owned, although he stated that he knew that her family owned a substantial amount of land. He stated that he visited only a couple of the parcels of property that her family owned. He testified that he and the wife had never discussed the extent and nature of her real property, her personal property, her bank accounts, or her cash. He stated that he did not have an understanding before their marriage as to the wife’s or the wife’s family’s net worth.
The husband testified that he had received and read a copy of the August 26, 1987, draft of the agreement, after which he had handwritten the document that White had used in preparing the final draft of the agreement. He testified that he had prepared that handwritten document a few days before the wedding. He stated that he did not know his handwritten document was going to be used by White to prepare the final draft of the agreement *1074 and that he did not give White the handwritten document.
The husband testified that he believed White had told him he could not represent him at the time he signed the agreement; however, he stated that he knew from the August 26, 1987, draft of the agreement that White was not representing him. He stated that he did not consult with anyone about the agreement. He admitted that he could have talked to a lawyer about the agreement and that no one had prevented him from doing so. He testified that he did not seek representation because he was ashamed that he was entering into an antenuptial agreement. He admitted that he signed the agreement and that no one had forced him to sign it.
The husband testified that it upset him when the wife first broached the subject of an antenuptial agreement. He testified that he informed the wife that he would not sign an antenuptial agreement and that she responded by indicating that their wedding would not take place. He testified that the subject was not raised again until a few days before the parties’ marriage. He stated that, as the date of the marriage neared, the wife indicated to him that her mother was pressuring her to have him sign an antenuptial agreement. The husband testified that he signed the agreement because the invitations for the wedding had already been mailed and the wife’s mother was “real upset and was going to call the marriage off.” According to the husband, the wife told him that the purpose of the agreement was to appease the wife’s mother and that the agreement “would not be used against” him.
On March 18, 2010, the trial court entered an order in which it concluded that the agreement was invalid. In pertinent part, the court wrote:
“1. The Antenuptial Agreement lacked adequate consideration and considering the totality of circumstances and facts surrounding the Antenuptial Agreement it is basically unfair and inequitable to the Husband and is disproportionate to the means of the Wife.
“2. That Agreement required the Husband to relinquish any rights that he might have to the Wife’s estate, however, the Agreement provided that should the Wife survive the Husband, she would have the right to claim homestead, dower, or any statutory substitute with respect to the parties’ marital home.
“3. The Agreement provides that the Husband and Wife disclose all the property owned by each party, both real, personal, tangible, and intangible. It further required the Wife to disclose the nature, extent, and probable value of all property that she may in the future acquire by gift, bequest, devise, inherit, purchase from both her mother, Mary Texas Hurt Garner or her uncle, John Frank Garner.
“4. The evidence is clearly contrary to the above and there is absolutely no evidence that sufficient information was contained within the agreement or attached to the agreement that set forth the nature, extent and probable value of these assets as specifically required by the Agreement. The Court finds that the testimony from the Husband and the Wife, as to any discussions as to the contents of the Agreement, were not of substance, led to quarrels or arguments, and led to the conclusion that if the Husband failed to sign the agreement if there was to be a marriage [sic]. Although there was testimony that the Husband had hunted on some of the family property and may have been on another portion of the Wife’s family property during their courtship, the Court is of the opinion that this informa *1075 tion is not sufficient to support a finding that the Husband had a general knowledge of the Wife’s estate and knew the extent of the Wife’s substantial estate.
“The Court finds the Husband was not adequately advised of the Wife’s assets and the nature, extent, and probable value of all property and other assets prior to or at the time he signed the Antenuptial Agreement and that he had insufficient general knowledge of the extent of the Wife’s assets in order to understand the rights or interests he was waiving when signing the Antenup-tial Agreement.
“5. The Court finds and the evidence supports that the Antenuptial Agreement was not entered into freely and voluntarily by the Husband, with competent independent advice.
“6. It is undisputed that the Husband did not have competent independent advice. The Agreement in this case was prepared by the Wife’s family attorney, John White. The Wife had a professional and close friendship [with] the Whites. The Wife served as the godmother to their child and worked for Mr. White prior to and after the signing of the Agreement. The testimony was conflicting as to whether the Husband was ever instructed to obtain the advice of counsel prior to signing the Agreement.
“7. The Court finds that independent counsel is indistinguishably tied to the requirement that the agreement was freely and voluntarily entered into and based upon the Husband’s lack of independent counsel the Court cannot find nor does the evidence support the entire Agreement was just and equitable.
“8. Considering the totality of circumstances and facts surrounding the Antenuptial Agreement it is basically unfair and inequitable to the Husband and is disproportionate to the means of the Wife.”
On April 15, 2010, the trial court made its March 18, 2010, order a final judgment pursuant to Rule 54(b), Ala R. Civ. P., finding that the issue regarding the validity of the agreement “significantly impacts divisions of property and awards of alimony upon final hearing.” The wife appeals.
The standard by which this court is required to review the trial court’s judgment in this case is well settled. Because the trial court’s decision is based on ore tenus evidence, we will presume that its factual findings are correct, and we will not set the judgment based on those findings aside unless they are plainly and palpably wrong or unjust. See Tyler v. Tyler, 990 So.2d 428, 428 (Ala.Civ.App.2008). We do not extend this presumption of correctness to the trial court’s application of the law to the facts, however. See Hinds v. Hinds, 887 So.2d 267, 271 (Ala.Civ.App.2003). Instead, we review a trial court’s application of the law to the facts de novo. See Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d 1253, 1255-56 (Ala.2004).
“It is well settled that antenuptial agreements are enforceable in Alabama.” Tyler, 990 So.2d at 426. “However, courts scrutinize such agreements to determine whether they are just and reasonable.” Barnhill v. Barnhill, 386 So.2d 749, 751 (Ala.Civ.App.1980). In Barnhill, this court described the test to be applied when the validity of an antenuptial agreement is put in issue. There, we wrote that an antenuptial agreement is valid and enforceable if the spouse seeking enforcement of the agreement demonstrates
“that the consideration was adequate and that the entire transaction was fair, just and equitable from the [other spousej’s point of view or that the agreement was freely and voluntarily entered *1076 into by the [other spouse] with competent independent advice and full knowledge of [his or] her interest in the estate and its approximate value.”
Barnhill, 386 So.2d at 751. “Meeting the requirements of either of [those] tests is sufficient to give effect to an antenuptial agreement.” Woolwine v. Woolwine, 519 So.2d 1347, 1349 (Ala.Civ.App.1987). See also Walters v. Walters, 580 So.2d 1350, 1351 (Ala.Civ.App.1990) (“We reiterate that the test in Barnhill is phrased in terms of an ‘either-or’ requirement.”).
The wife contends that the trial court erred when it concluded that there was insufficient consideration to support the agreement. She points out that marriage itself can serve as consideration for an antenuptial agreement, as can the parties’ mutual relinquishment of rights in each other’s estate. We agree.
In Woolwine v. Woolwine, supra, this court concluded that marriage served as adequate consideration for the antenuptial agreement at issue there. Reversing the trial court’s judgment, this court wrote:
“Marriage may, under appropriate circumstances, be sufficient consideration for an antenuptial agreement. Barnhill, 386 So.2d 749. In this instance marriage was clearly part of the consideration for executing this agreement. The husband was adamant in demanding that the wife sign an antenuptial agreement before he would marry her. As stated above, the wife was aware that it was necessary for her to sign the agreement in order to marry the husband. Therefore, it can be concluded that the marriage itself was sufficient consideration to support the antenuptial agreement.”
519 So.2d at 1349-50. See also Walters, 580 So.2d at 1351 (reversing trial court’s judgment and holding that marriage constituted adequate consideration for ante-nuptial agreement).
In Barnhill, this court concluded that the parties’ marriage and the husband’s relinquishment of any claim he may have to the wife’s estate constituted sufficient consideration to support an antenuptial agreement that the wife was seeking to avoid. Specifically with regard to the husband’s relinquishment of the wife’s estate, this court wrote: “[T]he husband by signing the [antenuptial] agreement gave up any right in what could be classified as the wife’s substantial estate. This relinquishment was ... valuable consideration.” Barnhill, 386 So.2d at 751. See also Strait v. Strait, 686 So.2d 1230, 1234 (Ala.Civ. App.1996) (parties’ marriage and their mutual relinquishment of rights in each other’s estate constituted adequate consideration for antenuptial agreement); and Tibbs v. Anderson, 580 So.2d 1337, 1339 (Ala.1991) (same).
In the present case, the husband testified that the wife had told him that the marriage would be called off if he did not enter into the agreement. He testified that he was not required to marry her and that he voluntarily entered into the agreement. The agreement itself provided that it was being entered into in consideration of the parties’ marriage. In addition, the agreement provided that each party would relinquish any claim he or she may have to particular real and personal property of the other that each owned at the time of the marriage. Those properties were listed in the agreement.
Based on the circumstances surrounding the parties’ marriage, as well as their mutual relinquishment of any claim to the other’s separate real and personal property, we find that the record does not support the trial court’s finding that the agreement was not supported by sufficient consideration. Furthermore, we conclude *1077 that the record establishes the initial element of the first Barnhill test (i.e., that adequate consideration supported the antenuptial agreement), and we conclude that the trial court erred when it found otherwise.
Next, the wife contends that the trial court erred when it determined that the agreement was unfair and inequitable to the husband. She points out that the fairness of an antenuptial agreement is not based on a comparison of what each party takes thereunder and that, in this case, the husband had at least a general knowledge of the rights that he was relinquishing under the agreement.
In Woolwine, this court addressed the question whether an antenuptial agreement was fair, just, and equitable from the other spouse’s point of view, as required by the second part of the first Barnhill test. Finding that it was, and reversing the trial court’s judgment, this court wrote:
“As noted above, not only must the consideration be adequate, but the entire transaction must have been fair, just, and equitable from the wife’s point of view. In this instance there is absolutely no evidence of fraud or duress in the execution of the agreement. The attorney who drafted the agreement testified that he advised the wife of its content and effect and further advised her to seek independent advice.
“Further, the evidence is that the husband and wife had discussed the agreement prior to their marriage and that the wife voluntarily agreed to sign. The testimony was that the wife chose not to seek independent advice contrary to the recommendation of the attorney who prepared the agreement.
“The evidence in all respects indicates that the antenuptial agreement was entered into voluntarily and, furthermore, that the wife knew what she was relinquishing when she signed the agreement. Additionally, the record indicates that the wife at least had a general knowledge of the extent of the husband’s estate. All of the above indicates that there was adequate consideration and that the transaction was fair, just, and equitable.
“It would appear to this court that a spouse should not be able to avoid an agreement signed before marriage simply by showing a substantial difference between his or her rights under the agreement and what might have been awarded by a court in the absence of such an agreement. Put another way, ‘unfairness’ under the instant facts does not relate to the amount awarded to a spouse pursuant to an antenuptial agreement.”
519 So.2d at 1850.
In Barnhill, this court found that the record supported a conclusion that the antenuptial agreement at issue there was fair, just, and equitable from the opposing spouse’s point of view. The court wrote:
“In this instance, there is absolutely no evidence of fraud or duress in executing the agreement. The attorney who drafted the agreement advised the wife as to the effect of the agreement prior to her signing it.
“The wife had the agreement several weeks prior to the marriage and there is evidence to indicate that the wife sought competent independent advice prior to the marriage concerning the agreement.
“The evidence in all respects indicates that the agreement was entered into voluntarily; furthermore, that the wife knew what she was relinquishing when she signed the agreement as shown by her reluctance in signing the agreement until the husband told her that he would *1078 not many her unless she signed an agreement. Additionally, the record indicates the wife at least had a general knowledge of the extent of the husband’s estate. All of the above goes to indicate the agreement was fair, just and equitable from the wife’s point of view.”
Barnhill, 386 So.2d at 752. See also Walters, 580 So.2d at 1351 (reversing trial court’s judgment and holding that ante-nuptial agreement was fair, just, and equitable from wife’s perspective when evidence demonstrated that wife chose not to secure outside legal advice about agreement and wife had a general knowledge of the husband’s estate).
Addressing the question whether an antenuptial agreement was unfair because of a disparity in the parties’ net worth, this court, in a plurality opinion, wrote:
“Finally, the trial court erred in applying the law on antenuptial agreements to the facts before it when it held, based upon the disparity of the parties’ net worths, that the antenuptial agreement was unfair and inequitable. As this court stated in Woolwine, the fairness of an antenuptial agreement is not to be judged based upon a comparison of what the spouse takes under the agreement with what he or she would have taken without the agreement. Woolwine, 519 So.2d at 1350. Likewise, a court should not concern itself with the disparity in income between parties to an antenuptial agreement in the absence of fraud, duress, or other culpable conduct on the part of one of the parties .... Typically, the reason parties enter into antenuptial agreements is because they have vastly different incomes and assets that they wish to protect in the case of divorce or death. The very impetus behind the creation of such agreements should not be a reason to set them aside as inequitable.”
Lemaster v. Dutton, 694 So.2d 1360, 1364 (Ala.Civ.App.1996).
The record in the present case reflects that the agreement was fair, just, and equitable from the husband’s point of view. There was absolutely no evidence of fraud or duress in the execution of the agreement, and the record reflects that the husband voluntarily signed the agreement. The husband had attended and graduated from law school, having taken courses in both contracts and estates and trusts. The agreement is clear with respect to the rights each party was relinquishing. Although the husband testified that he was not fully aware of the wife’s estate, the agreement itself listed every piece of real and personal property that each party owned at the time of the marriage over which the other party was relinquishing a claim. Although there was evidence, as the trial court found, that the values of those properties were not disclosed, despite a contrary indication in the agreement, we hold that the failure of the parties to have disclosed the values of the properties over which they each intended to maintain separate ownership does not void the agreement, especially given that the listing of those properties put both parties on notice of their existence and the fact that those properties would not be divided at the dissolution of the marriage.
This case presents a situation similar to the one presented in Strait v. Strait, 686 So.2d 1230 (Ala.Civ.App.1996). In Strait, the wife argued that she did not have adequate knowledge of her husband’s estate and, as a result, that their antenuptial agreement was invalid. The record disclosed that an exhibit was attached to the agreement listing both parties’ property. However, the exhibit did not specify that the value of the husband’s real property included therein was $1,175,000. Furthermore, the husband had failed to include on *1079 the exhibit certain of his property, including $45,000 in cash, and furniture, tools, and equipment worth $100,000. This court held that the wife’s knowledge of the husband’s estate was sufficient for purposes of upholding the antenuptial agreement:
“This court has held that when a spouse has at least a general knowledge of what he or she is relinquishing and a general knowledge of the extent of the other spouse’s estate, an antenuptial agreement based on adequate consideration is fair, just, and equitable. Barn-hill, supra, at 752; Woolwine, supra, at 1350. The evidence indicates that [the wife] was familiar with [the husband]’s assets, and that, although she may have not known of all his assets, she clearly had a ‘general knowledge’ of the rights she was relinquishing. Therefore, the trial court properly held that there was no genuine issue of material fact regarding [the wifej’s claim that the antenup-tial agreement was invalid.”
Strait, 686 So.2d at 1234. See also Walters, 580 So.2d at 1351 (reversing trial court’s judgment that antenuptial agreement was invalid and holding that the fact that the wife lived with the husband for six months before they married was sufficient to confer on her a general knowledge of the extent of the husband’s estate); Barnhill, 386 So.2d at 752 (holding that wife had a general knowledge of the husband’s estate at the time she entered into an antenuptial agreement with him when she had visited his home and some of his property before marriage, had known that he owned a substantial amount of land, and had known that he was in business with other family members in a farming operation).
We also conclude that the evidence demonstrates, without contradiction, that the husband was aware that the wife’s family possessed a large amount of real property and that the agreement excluded any inheritance she might receive of that property. That the wife did not disclose the exact properties she stood to inherit and the value of those properties does not demonstrate, as the trial court found, that the husband did not have a general understanding of the wife’s property that was being excepted from the marital estate. See Strait, supra. Indeed, one could hardly know, at the time of the marriage, exactly what the various members of the wife’s family would leave to her in their various testamentary dispositions at their deaths, given that those dispositions were subject to change at any time.
The fact that the agreement provided the wife, upon the husband’s death, with the right to claim homestead, dower, or any statutory substitute with respect to the house the husband owned before the marriage does not render the agreement unfair or inequitable, as the trial court apparently found. The trial court, in focusing on that provision, neglected the fact that the agreement provided that, should the wife die, the husband would be entitled to a life estate in any real property in which the parties were residing at the time of her death. Although the rights granted are not qualitatively equal, this does not provide a basis on which to invalidate the whole agreement, especially given the fact that, as stated above, there was adequate consideration flowing between the parties to support the validity of the agreement. As this court stated in Woolwine, “unfairness” with regard to the validity of an antenuptial agreement “does not relate to the amount awarded to a spouse pursuant to an antenuptial agreement.” 519 So.2d at 1350.
That no one told the husband to seek outside legal counsel does not render the agreement invalid in this case. Although the trial court correctly notes that *1080 the husband did not receive independent legal advice with regard to the agreement before he executed it, the evidence is clear that the husband had graduated from law school before the wife and he had become engaged. The husband testified that he knew he was entitled to seek legal advice with regard to the agreement, and he knew, from his review of the August 26, 1987, draft of the agreement, that White was not representing him with regard to the agreement. The only justification the husband provided for having failed to seek independent legal advice with regard to the agreement is that he was embarrassed that the wife wanted him to enter into the agreement. This, in our view, is not an adequate excuse for having failed to seek legal advice, and it does not cause his decision not to obtain independent legal advice to invalidate the agreement. See Nelson v. Estate of Nelson, 53 So.3d 922, 930 (Ala.Civ.App.2010) (“Sarah does not allege that fraud or duress was involved in the execution of the agreement or that she was in any way prevented from seeking legal counsel. Thus, if she did not consult with a lawyer, that was of her own choosing. Additionally, Sarah was highly educated and, as such, cannot be relieved of her legal contracts on the basis of failing to protect her own interests.”).[1]
Based on the foregoing, we conclude that the evidence of record demonstrates that the agreement was fair, just, and equitable from the viewpoint of the husband. Because, as previously noted, the agreement was supported by adequate consideration, we conclude that the first test set forth in Barnhill for the validity of an antenuptial agreement has been met in this case, and, as a result, the agreement is due to be enforced. The trial court’s judgment holding the agreement invalid is therefore reversed, and the cause is remanded to the trial court for additional proceedings.
The wife’s request for an attorney’s fee on appeal is denied.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and MOORE, JJ„ concur.
THOMAS, J., concurs in the result, without writing.

. We note the portion of the judgment in which the trial court pointed out that the wife had a "professional and close friendship” with White and his wife. We fail to see how the wife's relationship with White and his wife has any bearing on the validity of the agreement, especially given that the husband knew he was entitled to seek separate legal advice but chose not to do so.