THOMPSON, Presiding Judge.
Tahnya B. Northington ("the wife") appeals from a judgment of the Tuscaloosa Circuit Court ("the trial court") that, among other things, upheld the validity of a postnuptial agreement ("the agreement") she had entered into with David S. Northington ("the husband").
The only issue presented on appeal in this matter is whether the trial court erred in determining that the agreement was valid and enforceable. The evidence relevant to that issue indicated the following. The parties married in March 1995. Two children were born during the marriage; the wife had a child from a previous marriage, but the husband helped rear that child as his own. In late March 2012, the husband discovered that the wife was engaged in an extramarital affair. The wife of the man with whom the wife in this case was having the affair notified the husband. On April 2 or 3, 2012, the husband confronted the wife, who admitted that she had engaged in a physical sexual affair *328 with the man, who lived on the West Coast. The wife conceded that she had met the man online and had engaged in "phone sex" and "Skype sex," i.e., via computer using a web camera, with him before the man traveled to Alabama. The wife and the man met in Birmingham and carried out a physical affair.
When the husband confronted the wife, he gave her the option of divorcing or reconciling, with the condition that, if she chose reconciliation, she would sign a postnuptial agreement. The wife chose reconciliation, and the parties began marriage counseling. The parties also spent a considerable time-more than two years-crafting the agreement. The wife consulted with three attorneys during the course of negotiations and testified that she had made changes to various drafts of the agreement before executing it. The wife signed the agreement on June 23, 2014; the husband signed it on June 25, 2014. On December 8, 2015, the husband filed a complaint for a divorce in the trial court. The wife answered and filed a counterclaim alleging that the agreement was not fair or equitable and that it was obtained in a fraudulent manner because, she said, in making the agreement, the husband had withheld from her the value of his assets. The trial court held a bifurcated trial so that it could first determine the enforceability of the agreement.
There is no dispute that the wife was aware of the 14 parcels of real estate the husband claimed in the agreement as part of his separate estate. One of those parcels was a condominium in Gulf Shores that had been purchased from her grandfather's estate. The condominium was used for family vacations, and the wife was aware that it was also used as rental property. All of the other real estate was located in the Tuscaloosa/Northport area. The wife was also aware of Bama Exterminating Co., Inc. ("Bama Exterminating"), a family-owned business started by the husband's grandfather, which the parties treated as an asset of the husband.
In listing the real estate that he was claiming as his separate estate, the husband provided the wife with the cost of the individual parcels of real estate and the debt on those parcels. For example, the husband listed the cost of the Gulf Shores condominium as $190,000 and the debt on that condominium as $401,316. In total, the list of real estate the husband claimed, which was attached to the agreement as "Exhibit A," indicated that the total "cost" of the 14 parcels of real estate was $1,680,913 and that the total debt on those parcels was $1,356,763. Therefore, according to the information the husband provided to the wife regarding the difference between the cost and the debt of the 14 parcels of real estate, the husband had $324,150 in total equity in the parcels.[1]
Despite the wife's repeated requests, whether she made the request or the request was made through her attorney, the husband did not provide the wife with the value of the individual parcels of real estate or the equity he had in any of the real estate. In financial statements the husband provided to various banks during the time the agreement was being negotiated, however, the husband represented that the 14 parcels of real estate had a total fair market value of $4,455,000, and a total debt of $2,864,103, for a total equity of $1,590,897.
Similarly, Exhibit A listed several businesses in which the husband had an interest. The only business the wife discusses in *329 her appellate brief is Bama Exterminating. As he had with the real estate, the husband showed that Bama Exterminating had "costs" of "$294,431 (Fixed Assets)" and debt of "$265,171 (Liabilities)," leaving a net "value" of $29,260. However, the husband's "personal financial statements" indicated that Bama Exterminating had a value of $1,823,482. The difference in the "value" of Bama Exterminating as shown in Exhibit A and on financial statements created when the parties were negotiating the agreement is $1,794,222.
The wife testified that, during their negotiations, the husband provided her with what became Exhibit A, but he did not provide her with any financial statements. "Exhibit B," attached to the agreement, listed the wife's property. At the trial, the husband acknowledged that the wife and her attorney had at various times asked him for the market value of his assets. He said that he did not give her his opinion as to the value of his assets because, he said, he did not want to give her an inaccurate or subjective opinion. The husband also testified that he did not believe he had an obligation to provide the wife with the values she requested. Instead, the husband said, he suggested methods by which the wife could determine the value of the real estate, including talking to family members who worked in the real-estate or construction business; working with the Tuscaloosa County tax assessor, who was a personal friend, to obtain tax-assessed values of the real property in the Tuscaloosa/Northport area from the Tuscaloosa County tax assessor's office; or doing Internet research to obtain the values of the real property.
The wife testified that, before signing the agreement, she was aware of the real estate the husband owned and had seen most of the properties and the buildings and structures on them. She had taken vacations at the Gulf Shores condominium and had helped to decorate it.
The wife also testified that she never placed Bama Exterminating on the list of assets she wanted. She explained that she "was trying to be fair, that [she] wasn't trying to take [the husband's] company, his family company away from him." She said that one of her attorneys explained that, even if she did not want Bama Exterminating, it could be used in negotiations. However, the wife said, she never made a claim for Bama Exterminating or included it in any counterproposals she made to the husband.
The wife, who holds a bachelor's degree in nursing, testified that her attorney was present when she executed the agreement. She said that she did not recall her attorney at that time going over all of the details of the agreement with her, but, she said, she did not give the attorney "any impression" that she did not understand it. She also testified that, although she executed the agreement with the knowledge that it stated that she "fully understood the nature and extent" of the husband's estate and knew its approximate value, "I signed this, I really didn't understand it, but I did sign it." She said that she felt like she did not have a choice regarding whether to sign it, because, she said, the husband had told her that, if she did not sign the agreement, they "would go to war and that he would destroy me."
After the trial on the issue of the validity and enforceability of the agreement, the trial court entered a judgment concluding that the agreement was due to be enforced as written. After the final divorce judgment addressing all remaining issues was entered on February 6, 2017, the wife filed a timely notice of appeal to this court.
On appeal, the wife contends that, although the facts were generally not disputed, *330 the trial court misapplied the law to those facts.
" ' "When this Court must determine if the trial court misapplied the law to the undisputed facts, the standard of review is de novo, and no presumption of correctness is given the decision of the trial court. State Dep't of Revenue v. Garner, 812 So.2d 380, 382 (Ala. Civ. App. 2001) ; see also Ex parte Graham, 702 So.2d 1215 (Ala. 1997)." '
" American Res. Ins. Co. v. H & H Stephens Constr., Inc., 939 So.2d 868, 873 (Ala. 2006) (quoting Bean Dredging, L.L.C. v. Alabama Dep't of Revenue, 855 So.2d 513, 516-17 (Ala. 2003) )."
Ex parte Arvest Bank, 219 So.3d 620, 622 (Ala. 2016).
The wife contends that the agreement is not valid and enforceable because, she says, the "undisputed evidence" indicates that there was fraud in the inducement of her execution of the agreement. Specifically, the wife argues that the husband's refusal to disclose the values of the real estate and Bama Exterminating was a violation of what she said was his legal duty to fully and fairly disclose not only his assets, but also the value of those assets. In support of her argument that the husband was required to provide her with the values of the real estate listed in the agreement and Bama Exterminating, the wife first cites § 30-4-9, Ala. Code 1975, which provides that a "husband and wife may contract with each other, but all contracts into which they enter are subject to the rules of law as to contracts by and between persons standing in confidential relations." The wife then cites § 6-5-102, Ala. Code 1975, which sets forth a cause of action for fraudulent suppression. That statute provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." The wife reads §§ 30-4-9 and 6-5-102 together to assert that, because of their confidential relationship as husband and wife, the husband was legally required to provide her with the values of the real estate and Bama Exterminating. Because he withheld that information from her even though she requested it on several occasions, the wife says, the agreement was invalid because it was fraudulently induced.
The wife's argument is not compatible with well established Alabama law regarding the validity of postnuptial agreements.
"[P]renuptial and postnuptial agreements are valid in Alabama. Ala. Code 1975, §§ 30-4-9, 43-8-72 ; Ruzic v. Ruzic, 549 So.2d 72 (Ala. 1989) ; Woolwine v. Woolwine, 519 So.2d 1347 (Ala. Civ. App. 1987) ; Barnhill v. Barnhill, 386 So.2d 749 (Ala. Civ. App. 1980) ; cert. denied, 386 So.2d 752 (Ala. 1980) ; and Campbell v. Campbell, 371 So.2d 55 (Ala. Civ. App. 1979). However, courts scrutinize such agreements to determine whether they are just and reasonable. Woolwine; Barnhill; Hall v. Cosby, 288 Ala. 191, 258 So.2d 897 (1972) ; and Hamilton v. Hamilton, 255 Ala. 284, 51 So.2d 13 (1951)."
Tibbs v. Anderson, 580 So.2d 1337, 1339 (Ala. 1991). "Prenuptial and postnuptial agreements are scrutinized by the same standards." Nelson v. Estate of Nelson, 53 So.3d 922, 927 (Ala. Civ. App. 2010).
The wife argues that, because she was not provided with the values of the real estate and Bama Exterminating, the formation of the agreement was unfair and inequitable. In Barnhill v. Barnhill, 386 So.2d 749 (Ala. Civ. App. 1980), this court
*331 "established the either/or test that we use here in determining whether the agreement is valid. This test may be applied in postnuptial agreements, as well as prenuptial agreements, and it states that, in order for an agreement to be valid, the one seeking to enforce the agreement 'has the burden of showing that the consideration was adequate and that the entire transaction was fair, just and equitable' from the other party's point of view or'that the agreement was freely and voluntarily entered into ... with competent, independent advice and full knowledge of [any] interest in the estate and its approximate value.' Barnhill, 386 So.2d at 751."
Tibbs, 580 So.2d at 1339.
In Tibbs, our supreme court provided an analysis of the application of what has come to be known as the Barnhill test. Because the wife does not challenge the adequacy of the consideration for the agreement, we need not discuss that aspect of the Barnhill test in this opinion. As to whether the entire transaction is fair, just, and equitable from the point of view of the party against whom it is being enforced, our supreme court in Tibbs wrote:
"The first test in Barnhill further requires that the proponent of the agreement must show that the agreement was fair, just, and equitable from the other party's point of view. In this case, the wife testified that she had read the agreement several times and that she understood its contents. In addition, there was evidence from which the trial court could infer that she knew the general extent of Mr. Tibbs's estate. Furthermore, despite the fact that she was initially reluctant to sign the agreement, she nevertheless voluntarily signed it. There was sufficient evidence upon which the trial court could base its finding that the agreement was valid. There is no indication that the trial court was plainly and palpably wrong in holding that this agreement was fair, just, and equitable from the wife's point of view. Therefore, the requirements of the first test have been met."
580 So.2d at 1340 (emphasis added).
Moreover, it is worth noting that a plurality of this court has held that a disparity between each party's net worth is not a consideration when determining whether a prenuptial or postnuptial agreement is fair and equitable. Lemaster v. Dutton, 694 So.2d 1360, 1364 (Ala. Civ. App. 1996). "Typically, the reason parties enter into antenuptial agreements is because they have vastly different incomes and assets that they wish to protect in the case of divorce or death. The very impetus behind the creation of such agreements should not be a reason to set them aside as inequitable." Id.
In Woolwine v. Woolwine, 519 So.2d 1347 (Ala. Civ. App. 1987), this court addressed the question whether a prenuptial agreement was fair, just, and equitable from the point of view of the spouse against whom it was sought to be enforced, as required by the second part of the first Barnhill test. Finding that it was, and reversing the trial court's judgment, this court wrote:
"As noted above, not only must the consideration be adequate, but the entire transaction must have been fair, just, and equitable from the wife's point of view. In this instance there is absolutely no evidence of fraud or duress in the execution of the agreement. The attorney who drafted the agreement testified that he advised the wife of its content and effect and further advised her to seek independent advice.
"Further, the evidence is that the husband and wife had discussed the agreement prior to their marriage and that *332 the wife voluntarily agreed to sign. The testimony was that the wife chose not to seek independent advice contrary to the recommendation of the attorney who prepared the agreement.
"The evidence in all respects indicates that the antenuptial agreement was entered into voluntarily and, furthermore, that the wife knew what she was relinquishing when she signed the agreement. Additionally, the record indicates that the wife at least had a general knowledge of the extent of the husband's estate. All of the above indicates that there was adequate consideration and that the transaction was fair, just, and equitable.
"It would appear to this court that a spouse should not be able to avoid an agreement signed before marriage simply by showing a substantial difference between his or her rights under the agreement and what might have been awarded by a court in the absence of such an agreement. Put another way, 'unfairness' under the instant facts does not relate to the amount awarded to a spouse pursuant to an antenuptial agreement."
519 So.2d at 1350 (emphasis added).
The wife in this case argues that the Barnhill test is inapplicable because, she says, she was fraudulently induced to execute the agreement. However, Barnhill has been applied in instances similar to the instant case. In Strait v. Strait, 686 So.2d 1230 (Ala. Civ. App. 1996), this court affirmed the trial court's determination that a prenuptial agreement was valid. The wife in that case had argued that the agreement she signed was void because, among other things, she said that she had entered into the agreement without "full knowledge of [her husband's] assets." Id. at 1234. In affirming the validity of the agreement, this court noted that, when she was deposed, the wife
"stated that, while she was aware of the property that [her husband] owned, she was not informed of its value. However, she stated that nothing prevented her from obtaining an appraisal of his property to ascertain the value. Furthermore, she testified that she had gone through a divorce from [her husband] in 1991 and that on that occasion they had to go to court to divide some of the property that they owned. The agreement was accompanied by an exhibit listing [their separate] property. The exhibit listed [her husband's] real property assets, many of which were rental properties, and the monthly income from the various properties. [The wife] asserts that she was unaware when she signed the agreement that [her husband] had cash on hand of $45,000; furniture, tools, and equipment worth $100,000; and that the value of the real estate was $1,175,000. She asserts that she did not have adequate knowledge because the exhibit did not list the value of the properties, and excluded the cash and the personal property values.
"This court has held that when a spouse has at least a general knowledge of what he or she is relinquishing and a general knowledge of the extent of the other spouse's estate, an antenuptial agreement based on adequate consideration is fair, just, and equitable. Barnhill, supra, at 752, ; Woolwine, supra, at 1350. The evidence indicates that [the wife] was familiar with [her husband's] assets, and that, although she may have not known of all his assets, she clearly had a 'general knowledge' of the rights she was relinquishing."
Id.
Similarly, in Robinson v. Robinson, 64 So.3d 1067 (Ala. Civ. App. 2010), this court *333 held that an prenuptial agreement was valid and enforceable. Relying on Strait, supra, as authority, we explained:
"The record in the present case reflects that the agreement was fair, just, and equitable from the husband's point of view. There was absolutely no evidence of fraud or duress in the execution of the agreement, and the record reflects that the husband voluntarily signed the agreement. The husband had attended and graduated from law school, having taken courses in both contracts and estates and trusts. The agreement is clear with respect to the rights each party was relinquishing. Although the husband testified that he was not fully aware of the wife's estate, the agreement itself listed every piece of real and personal property that each party owned at the time of the marriage over which the other party was relinquishing a claim. Although there was evidence, as the trial court found, that the values of those properties were not disclosed, despite a contrary indication in the agreement, we hold that the failure of the parties to have disclosed the values of the properties over which they each intended to maintain separate ownership does not void the agreement, especially given that the listing of those properties put both parties on notice of their existence and the fact that those properties would not be divided at the dissolution of the marriage."
Id. at 1078.
In the instant case, the undisputed evidence indicates that the wife, although perhaps reluctant to do so, agreed to sign the postnuptial agreement rather than end the marriage after the husband discovered her affair. The negotiations regarding the agreement lasted some 27 months, and the wife consulted with 3 attorneys. She was represented by an attorney at the time she executed the agreement. The agreement listed all of the real estate the wife was agreeing to relinquish, as well as Bama Exterminating. The wife had been married to the husband for almost 20 years at the time the agreement was signed, and she was familiar with the real estate, as well as the income derived from Bama Exterminating. Although the husband did not provide the wife with the market values of the real estate as she had requested, he did provide her with methods she could use to learn the values of the properties. Some of the real estate on the husband's list had been in the wife's family and had been purchased from one of her family members. Nonetheless, during the 27 months of negotiating the agreement, the wife was aware that she did not know the market values of the properties at issue, yet she chose not to avail herself of any of the husband's suggestions for learning those values.
The evidence presented supports a conclusion that the wife knew specifically which real-estate properties she would be giving up pursuant to the agreement, she was familiar with those properties, she consulted with attorneys during the negotiations regarding the agreement and was represented by counsel at the time she signed the agreement, and she had more than a general knowledge of the extent of the husband's estate at the time the agreement was signed. Additionally, there is no evidence indicating that she was under duress at the time she signed the agreement.
Based on the foregoing, we conclude that the evidence demonstrated that the agreement was fair, just, and equitable from the wife's point of view. Accordingly, the trial court's determination that the postnuptial agreement was valid and enforceable is due to be affirmed.
AFFIRMED.
Pittman, Thomas, and Moore, JJ., concur.
Donaldson, J., recuses himself.

In her brief on appeal, the wife states that the husband had "negative equity" totaling $346,891 in the 14 parcels of real estate. This court cannot determine how the wife reached that conclusion.